# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

| | | |
|---|---|---|
| PROVISUR TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-6069-SRB |
| | ) | |
| WEBER, INC., TEXTOR, INC., WEBER | ) | |
| MASCHINEBAU GMBH BREIDENBACH, | ) | |
| WEBER MASCHINENBAU GMBH | ) | |
| NEUBRANDENBURG, and TEXTOR | ) | |
| MASCHINEBAU GMBH, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This patent-infringement suit between Plaintiff Provisur Technologies, Inc. ("Provisur") and Defendants Weber, Inc. et al.[1] ("Weber") involves two patents relating to commercial meat and cheese slicing machines. Those two patents (hereinafter the "Patents-at-Issue") are United States Patent Nos. 10,625,436 ("the '436 Patent") and 10,639,812 ("the '812 Patent").

On June 3, 2021, Weber filed an opening claim-construction brief (Doc. #85) pursuant to Patent Local Rule 4.5(a), asking the Court to construe four disputed claim terms in the Patents-at-Issue. Provisur filed its responsive brief on June 14, 2021 (Doc. #86), and Weber filed a reply brief on June 28, 2021 (Doc. #87). The Court held a claim-construction hearing (i.e., *Markman* hearing) on July 23, 2021. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996); Patent L.R. 4.6.

---

[1] Defendants in this suit are interrelated corporate entities and subsidiaries that, for purposes of this Order, are referred to collectively as Weber and are distinguished individually only where needed.

Upon review and consideration of the patent claims, specifications, and the prosecution history, in addition to the parties' claim-construction briefs, applicable law, and presentations by counsel, the Court hereby issues this Order to construe the disputed terms in the Patents-at-Issue. For the reasons discussed herein, the Court construes the terms as follows:

| DISPUTED TERMS | CONSTRUCTION |
|---|---|
| "food article gripper" | a device that closes and opens to seize and release an end of the food product |
| "upper conveyor assembly" | overhead conveyor system positioned over the food article loading apparatus |
| "food article stop gate" | single movable structure that provides the three positions: (1) gate, (2) bridge, and (3) door |
| "when the lift tray assembly is moved when in its elevated position" | plain and ordinary meaning |

## I. BACKGROUND

Provisur, the owner and assignee of the Patents-at-Issue, is a Delaware corporation with its principal place of business in Chicago, Illinois. Provisur and its subsidiaries design, produce, and sell various commercial food-product processing technologies. Provisur initiated this suit, in addition to a separate related patent-infringement action,[2] alleging Weber is actively infringing the Patents-at-Issue by their manufacture and sale of several commercial slicing machines such as the Weber Slicer S6, the Weber Slicer 900 Series, and other Textor TS750 products.

Broadly, the machinery underlying this patent-infringement suit is a high-speed industrial slicing machine comprised of a series of belts, conveyors, scanners, sensors, and machine parts. Bulk food products—such as loaves or blocks of meat or cheese, referred to generally as a food article—are loaded into the slicer, sliced, and transported down the line for additional processing, sorting, and packaging. Below is an illustrative drawing of the slicing machine:

---

[2] *See Provisur Technologies, Inc. v. Weber Inc., et al.*, Case No. 19-cv-6021-SRB (W.D. Mo.) (Bough, J. presiding).

2



While the Patents-at-Issue have a combined twenty-seven claims, the parties seek construction of only four terms appearing in the following claims:

> (1) "food article gripper"—'436 Patent (Claims 1–2, 6, 9–12, & 14); '812 Patent (Claim 1);
>
> (2) "upper conveyor assembly"—'436 Patent (Claims 1 & 9); '812 Patent (Claim 1);
>
> (3) "food article stop gate"—'436 Patent (Claims 1, 8, 9, & 16); '812 Patent (Claim 1); and
>
> (4) "when the lift tray assembly is moved when in its elevated position"—'436 Patent (Claims 1 & 9).

The first three terms are common to both the Patents-at-Issue.

## II. LEGAL STANDARD

Claim construction, "including terms of art," is a matter of law. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388–89 (1996)). This Court looks to the Federal Circuit for persuasive guidance when evaluating patent-related matters, *U.S. Water Servs., Inc. v. ChemTreat, Inc.*, 794 F.3d 966, 970 (8th Cir. 2015), and the following claim-construction analysis is guided by the Federal Circuit's landmark opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). When construing

3

claims, the Court begins with the words of the claim, which define the invention and its scope. Claim terms "are generally given their ordinary and customary meaning"—that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations omitted).

In ascertaining the ordinary and customary meaning of a patent claim term, a court may consider various sources of information, which are traditionally categorized as either "intrinsic" or "extrinsic" evidence. *See id.* at 1314. Intrinsic evidence generally encompasses "the words of the claims themselves," the specifications of the patent, and the patent's prosecution history. *Id.* The specifications section of a patent, which describes the specific embodiments of the invention in a "full" and "exact manner," is "highly relevant to the claim construction analysis" and can be the "single best guide to the meaning of the disputed term." *Id.* at 1311–12, 1315 (citing 35 U.S.C. § 112); *accord Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis."). Additionally, the prosecution history of the patent, meaning the record of the proceedings before the U.S. Patent and Trademark Office ("PTO"), is also helpful in the claim-construction analysis and provides the Court with "evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.

A court may also consider sources of extrinsic evidence when construing a claim term, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citation omitted). These sources

4

of evidence are often utilized to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. However, the intrinsic record remains more significant to determining the legally operative meaning of claim language, and extrinsic evidence cannot be used to "vary or contradict the claim language" itself. *Vitronics Corp.*, 90 F.3d at 158; *see also Phillips*, 415 F.3d at 1318 (noting "extrinsic evidence in general [i]s less reliable than the patent and its prosecution history in determining how to read claim terms").

## III. DISCUSSION

The parties dispute the meaning of four terms across the Patents-at-Issue. Each disputed claim term is discussed below.[3]

### A. Term I: "food article gripper"

The table below depicts the two competing constructions offered by the parties for the plain and ordinary meaning of the term "food article gripper":

| PROVISUR'S PROPOSED CONSTRUCTION | WEBER'S PROPOSED CONSTRUCTION |
|---|---|
| a structure that grips food articles | a device that closes and opens to grasp and release an end of the food product |

An illustrative example of the use of the term "food article gripper" appears in Claim 1 of the '436 Patent:

1. A food article slicing machine, comprising:

---

[3] In their opening brief, Weber states that for purposes of construing the disputed claim terms, a person of ordinary skill in the art of the technical field of the Patents-at-Issue at the relevant time would typically have had: "(1) a bachelor's degree (or equivalent) in mechanical engineering (or a similar field) and at least two years of experience working on food processing and/or packaging systems (or in a similar field); or (2) at least seven years of experience working on food processing and/or packaging systems (or in a similar field)." (Doc. #85, p. 8.) Provisur does not refute this proffered standard, and the Court finds it applies to the claim construction discussed herein.

5

. . .

> a food article feed apparatus disposed over the food article loading apparatus having an upper conveyor assembly with a driven endless conveyor belt used in cooperation with a food article gripper for moving the food articles along the food article feed path[.]

(Doc. #85-1, p. 29, 10:56–65.)[4]

While the parties agree that the term "food article gripper" should be given its plain and ordinary meaning, they disagree as to what that meaning is.  Provisur urges the Court to adopt its construction, which "encompasses each gripper example described in the intrinsic evidence, including gripper ribs/ridges on a conveyor belt."  (Doc. #86, p. 11.)  Weber rejects this broad construction, contending that just because a "structure creates friction or grip does not make it a food article gripper" as described by the Patents-at-Issue.  (Doc. #87, p. 8.)  Weber argues that a person of ordinary skill in the art would not understand the term "gripper," within the context of the Patents-at-Issue, to include nubs or ribs on a conveyor belt.  Instead, Weber states "gripper" is a "well-understood term-of-art in the [patent field]" used to describe a mechanical device "that grasps and releases an object."  (Doc. #85, p. 10.)

Regarding the need for the Court to construe this term, the Court agrees there is a genuine dispute regarding the meaning and the scope of "food article gripper."  The parties sufficiently demonstrated, in both their claim-construction briefing and during the *Markman* hearing, that "gripper" can have either a broad or a narrow meaning to a person of ordinary skill in the art of the technical field.  Those differing constructions greatly impact the scope of the invention, thus making it necessary for the Court to construe the term.  *See O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more

---

[4] All page citations herein refer to pagination automatically generated by CM/EFC.

6

than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

Upon review, the Court agrees with Weber's proposed construction, subject to certain modifications, because it comports most closely with the claim language and is reinforced by the intrinsic record. Taken as a whole, the intrinsic evidence presents the "food article gripper" as an active device that utilizes an open-and-close functionality to grasp and release food articles. The '436 Patent specifications repeatedly describe the open-and-close functionality of the food article gripper. The specifications explain that "[e]ach gripper is provided with two air lines for two-way pneumatic gripper open and-close operability." (Doc. #85-1, p. 27, 6:50–52.) That open-and-close operability is activated by a laser detector feeding information into a machine control, which uses servomotors "to control the positioning of the grippers to the ends of each food article" and lets the "grippers know when to be activated to seize the food article." (Doc. #85-1, p. 29, 10:24–29.) The language of Claim 4 in the '436 Patent similarly embodies this open-and-close operability, explaining "the food article gripper is driven and controlled when the gripper seizes a food article." (Doc. #85-1, p. 30, 11:15–18.); *Phillips*, 415 F.3d at 1314 (noting claims of the patent in question can be "valuable sources of enlightenment as to the meaning of a claim term . . . [b]ecause claim terms are normally used consistently throughout the patent" and "the usage of a term in one claim can often illuminate the meaning of the same term in other claims").

Furthermore, the U.S. Patent No. 5,628,237 ("the '237 Patent"), which is incorporated by reference in the Patents-at-Issue (Doc. #85-1, p. 27, 6:65–67), describes a gripper that utilizes an open-and-close functionality to actuate and retract small metal hooks or "tines" into the end of a food product. (Doc. #85-11, pp. 29–31, 18:18–32; 19:55–60; 22:42–55.) Taken as a whole, the language, diagrams, and specifications of the Patents-at-Issue describe "food article gripper" as a

7

device that does more than passively grip the side of a food article.[5] However, Provisur declined to include this open-and-close operability and seizing action in its proposed construction, which the Court finds to be so generic that it would be unhelpful to a jury. *See, e.g.*, *Jackson v. Mizuho Orthopedic Sys., Inc.*, No. 12-CV-01031, 2014 WL 1343101, at *5 (W.D. Mo. Apr. 4, 2014) (quoting *Markman*, 52 F.3d at 979) (rejecting a generic construction that was unsupported by the patent's claim language).

While less persuasive than the intrinsic record, the extrinsic evidence advanced by Weber also supports finding that a person of ordinary skill in the art would understand the term "food article gripper" to mean a device that opens and closes to seize and release a food article. Weber identifies various industry-specific dictionaries, textbooks, and references which define "gripper" consistent with its usage in the Patents-at-Issue:

> **Gripper:** the grasping hand of the robot which manipulates objects and tools to fulfill a given task. (Doc. #85-5, p. 4) (HANDBOOK OF INDUSTRIAL ROBOTICS (Shimon Y. Nof, ed., 1985)).

> The simplest type of gripper is a motion-producing device that is joined by two fingers. The fingers open and close to grasp an object. (Doc. #85-6, p. 4) (REX MILLER, FUNDAMENTALS OF INDUSTRIAL ROBOTS AND ROBOTICS 27 (1988)).

> **Gripper:** an end effector on a robot used to pick up components. A general purpose gripper will have two or more fingers similar to a human hand. (Doc. #85-8, p. 5) (TONY ATKINS & MARCEL ESCUDIER, OXFORD DICTIONARY OF MECHANICAL ENGINEERING 160 (2013)).

> The simplest type of end efforts are grippers . . . which usually are capable of only two actions, opening and closing. (Doc. #85-19, p. 5) (MARK W. SPONG & M. VIDYASAGAR, ROBOT DYNAMICS AND CONTROL 19 (1989)).

---

[5] In their briefing, both sides cite to isolated, discrete portions of the prosecution histories for the Patents-at-Issue and other related patents in support of their proposed constructions. The Court reviewed each of those cited exhibits, which on balance do not weigh strongly in favor of either side's proposed construction. *See Phillips*, 415 F.3d at 1317 (observing that a patent's prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," and acknowledging that as a result, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes"). Ultimately, the Court finds the prosecution history does not undermine Weber's proposed construction, though the prosecution history itself is not dispositive in construing this disputed term as it is used within the Patents-at-Issue.

8

The industry-specific texts and reference materials cited by Provisur similarly acknowledge that the original iteration of a gripper is one with a mechanical pinching or grasping function that is traditionally actuated by pneumatic power. *See* (Doc. #86-5, pp. 10–11.) The extrinsic evidence in this case reinforces the Court's finding that the specifications describe "food article gripper" in a manner consistent with the ordinary meaning of that claim term.

In arguing Weber's construction of the term "gripper" is too narrow, Provisur notes that various manufacturers produce grippers that operate solely as vacuums and lack the open-and-close or grasping functionality. Provisur also cites various patents which define "gripper" as a static nub or ridge on a conveyor belt which gives the belt a gripping surface. (Doc. #86, pp. 13–14.) These extrinsic sources of evidence are unpersuasive. The fact that conveyor belts with a static or passive grip function exist within the industry does not convince the Court that the term "food article gripper," as used in the Patents-at-Issue, adopts that broader definition. Given the specific language in the Patents-at-Issue emphasizing the seizing function of the "food article gripper," Provisur's extrinsic evidence attempts to "vary or contradict the claim language" itself. *Vitronics Corp.*, 90 F.3d at 158. While not dispositive, the extrinsic evidence weighs in favor of Weber's proposed construction.

Provisur's primary argument is that Weber's construction deviates from the general rule that limitations from specifications should not be imported into the claim to limit its scope, citing *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003). In *Anchor Wall*, the Federal Circuit noted that while a particular embodiment of a patent does not limit the claims to that specific configuration, "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Id.* at 1306–07 (citations omitted). That being said, "it is entirely proper to use the specification

9

to interpret what the patentee meant by a word or phrase in the claim." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In this case, the Court finds the specifications inform the Court as to what the patentee meant by the term "food article gripper"—a separate gripper structure which seizes the end of a food article or product using an open-and-close function. Because the claims already contain this limitation for the reasons discussed earlier, the Court "cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions[.]" *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).

After considering both the intrinsic and extrinsic record, the Court generally agrees with Weber's preferred construction. While portions of the prosecution history reveal that, a certain times, there may have been a different understanding of the term "gripper," those instances do not outweigh the remainder of the intrinsic evidence, in particular the patent specifications and claim language that expressly discuss the open-and-close operability and seizing function of the gripper. However, the Court substitutes "grasp" with "seize" in light of its usage throughout the Patents-at-Issue. (Doc. #85-1, pp. 29–30, 10:28–29; 11:16–18; Doc. #85-2, p. 29, 10:46–48.) The term is thus construed as follows:

| TERM | CONSTRUCTION |
|---|---|
| "food article gripper" | a device that closes and opens to seize and release an end of the food product |

## B. Term II: "upper conveyor assembly"

Weber contends the term "upper conveyor assembly" is not a common term in the art and requires construction by the Court. Provisur argues that the plain and ordinary meaning should control and no further description is required, but alternatively proposes a construction. Below is a table depicting the parties' competing constructions:

10

| PROVISUR'S PROPOSED CONSTRUCTION | WEBER'S PROPOSED CONSTRUCTION |
|---|---|
| plain and ordinary meaning, including a conveyor system disposed over the food article loading apparatus | overhead conveyor system for positioning and driving food article gripper(s) |

Illustrative examples of the use of the term "upper conveyor assembly" appear in Claim 1 and

Claim 9 of the '436 Patent:

> 1. A food article slicing machine, comprising:
> . . .
> a food article feed apparatus disposed over the food article loading apparatus having an upper conveyor assembly with a driven endless conveyor belt used in cooperation with a food article gripper for moving the food articles along the food article feed path[.]
> . . .
> 9. A food article slicing machine, comprising:
> . . .
> wherein the conveyor assembly is an upper conveyor assembly.

(Doc. #85-1, pp. 29–30, 10:56–65; 12:5–6.)

While the parties proffer differing constructions,[6] they agree that "upper," in the context

of the Patents-at-Issue, refers to the physical location of the conveyor assembly. The Patents-at-

Issue describe a "food article loading apparatus having an upper conveyor assembly," which the

Court believes, and neither party disputes, an ordinary person skilled in the art would understand

to mean that the "upper conveyor assembly" is located over, or above, the food article loading

apparatus. Weber argues the term should be construed as an "overhead conveyor" specifically

used to position and drive food article grippers. (Doc. #85, p. 13.) While Provisur agrees the

construction should include some positional language (e.g., "disposed over"), Provisur contends

---

[6] The parties do not dispute, and the Court finds, that the term "conveyor" should be given its plain and ordinary meaning and requires no further construction from the Court. Similarly, the parties do not dispute, and the Court finds, that an ordinary person skilled in the art would understand the term "assembly" to mean a single, functional unit containing multiple component parts. (Doc. #85, p. 13.) However, both parties advance constructions using the term "system" and, upon review, the Court incorporates that synonymous term into its construction. *See system*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/system (last visited July 27, 2021) (defined, in part, as "a regularly interacting or interdependent group of items forming a unified whole").

that narrowing the claim scope to only include conveyor systems which control the food article grippers improperly imports limitations from the specifications into the claims.

The Court adopts Provisur's construction of "upper conveyor assembly," subject to some modifications, finding it comports most closely with the claim language. The claim language in the Patents-at-Issue explain that the "upper conveyor assembly" has a driven endless conveyor belt "used in cooperation with a food article gripper," which even a lay person would understand to mean that the two components, the belt and the grippers, work together. (Doc. #85-1, pp. 29–30, 10:56–65.) The patentee made a deliberate decision to link the conveyor system with the food article grippers in certain claims by including that "in cooperation" language. If the Court construed "upper conveyor assembly" as urged by Weber, it would render the "in cooperation" language superfluous and redundant. In contrast, the construction advanced by Provisur gives meaning to all of the claim terms. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). While the words "driven" and "positioning" are used to explain the conveyor system's relationship to the food article grippers in the brief summary of the invention (Doc. #85-1, p. 25, 2:56–58), the Court declines to limit the scope of the claims due to that language alone.

The parties briefly argue about certain statements made during the prosecution history of the Patents-at-Issue, but the Court finds those references insufficient to overcome the language of the patent claims. Weber cites to the prosecution history of the Patents-at-Issue in support of the argument that the claims should be narrowed to mean that the "upper conveyor assembly" only drives and positions food article grippers. However, the cited portions of the prosecution history do not contradict Provisur's proposed construction. As for Weber's reliance on the prosecution

12

history of the '325 Patent, the Court finds that the upper conveyor assembly in the '325 Patent is distinguishable from the Patents-at-Issue and does not disavow the plain and ordinary meaning of the term as advanced by Provisur.  *See Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1349 (Fed. Cir. 2013) (citation and quotation marks omitted) ("When narrowing claim scope . . . a clear and unmistakable disavowal during prosecution overcomes the heavy presumption that claim terms carry their full ordinary and customary meaning.").  As for the parties' arguments relying on extrinsic evidence, because the intrinsic evidence supports Provisur's construction, the Court need not consider the extrinsic evidence submitted regarding this disputed term.

In conclusion, the Court generally agrees with Provisur's proposed construction, which is supported by the intrinsic record.  However, the Court adds the positional description suggested by Weber ("overhead") to connote the location of the "upper conveyor assembly" in relation to the food article loading apparatus.  The Court also substitutes "disposed" with "positioned" given its usage throughout the Patents-at-Issue and to provide clarity for the jury.  *See 3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 964 (D. Minn. 2005) (citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)) (noting "the Court's fundamental duty in a patent case is to provide the jury with instructions adequate to ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims").  The Court thus construes the term "upper conveyor assembly" as follows:

| TERM | CONSTRUCTION |
|---|---|
| "upper conveyor assembly" | overhead conveyor system positioned over the food article loading apparatus |

## C. Term III: "food article stop gate"

While the parties largely agree about the operation and functionality of the "food article stop gate" used within the Patents-at-Issue, the parties offer differing constructions of the term. The table below depicts the parties' proposed constructions:

| PROVISUR'S PROPOSED CONSTRUCTION | WEBER'S PROPOSED CONSTRUCTION |
|---|---|
| Movable structure that provides the three recited (1) gate, (2) floor, and (3) door features of each claim | Single structure having three positions that alone provides all three recited functions |

An illustrative example of the use of the term "food article stop gate" appears in Claim 1 of the '436 Patent:

> 1. A food article slicing machine, comprising:
>    . . .
>    a food article stop gate disposed upstream of the slicing station that forms a portion of the food article feed path,
>
>    wherein the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved when in its elevated position, and
>
>    wherein the food article stop gate also opens to drop food article end portions.

(Doc. #85-1, p. 30, 11:1-8.) The parties agree the three key functions of the "food article stop gate" are: (1) the "gate" function, which stops the food product before slicing; (2) the "floor" or "bridge" function, which supports the food product during slicing; and (3) the "door" function, which acts as a trap door to discard the food product's end portions after slicing. (Doc. #85, p. 16; Doc. #86, p. 18.) Those three positions are sequentially illustrated in the following diagrams from the Patents-at-Issue (Doc. #85-1, p. 24; Doc. #85-2, p. 24), with the stop gate identified as part 2020:

14



**Figure 13A**  **Figure 13B**  **Figure 13C**

Weber argues their proposed construction captures the "all-in-one structure" that is the distinguishing feature of the "food article stop gate." (Doc. #85, p. 16.) Weber emphasizes how their construction explains that the "food article stop gate" provides three positions—(1) the "gate" position, (2) the "floor" position, and (3) the "door" position—"without the need for other structures" as claimed during the '436 Patent's prosecution history. (Doc. #85, p. 16.) Provisur asks the Court to reject Weber's construction because it "introduces unnecessary confusion into the claim" for a jury by defining the "food article stop gate" as a "single" structure that "alone" provides the three recited functions without identifying what those specific functions are. (Doc. #86, p. 17.) During the *Markman* hearing, the parties extensively argued the merits of certain constructions over others, including the impact of using the word "feature" instead of "position" and whether to identify the three key gate functions in lieu of generally referencing them. Additionally, the Court remains mindful of its obligation to construe the disputed term in a way that provides the jury with clear, objective, and accurate guidance so they may fully understand a claim's meaning and scope. *See Sulzer Textil*, 358 F.3d at 1365–66.

Upon review, the Court finds intrinsic record supports a construction that describes the "food article stop gate" as a "single moveable structure." The parties agree the "food article stop gate" is a "moveable structure" within the plain and ordinary meaning of that term. However,

15

there is significant dispute on whether that movable structure operates "alone," as suggested by Weber's construction, or in cooperation with other machinery components as argued by Provisur.

Provisur argues the word "single" contradicts the claim language, which explains that the "food article stop gate" is one of several components involved in performing the "gate," "floor," and "door" operations. (Doc. #86, p. 18.)  Provisur points to claim language explaining the stop gate "forms *a portion* of the food article feed path" and that any food articles "are supported in position along the food article feed path by *at least* the food article stop gate." (Doc. #85-1, p. 30, 11:1–5) (emphasis added).  The Court agrees the Patents-at-Issue do not describe the "food article stop gate" as performing the three key functions unilaterally, which supports Provisur's arguments against including the term "alone."  However, the claim language does not contradict Weber's inclusion of the word "single," given that the Patents-at-Issue do not describe any other structure which performs all three key functions.  Similarly, the mere fact that the specifications describe the mechanisms which actuate the stop gate does not contradict Weber's argument that the "food article stop gate" is the only structure that can perform the "gate," "floor," and "door" functions.  Accordingly, the Court believes that a construction which omits "alone" but retains "single" best captures the meaning of the term "food article stop gate" as it would be understood by an ordinary person skilled in the art, in light of how the term is used in the Patents-at-Issue.

Moreover, the prosecution history of the Patents-at-Issue offers persuasive evidence in support of Weber's argument that "food article stop gate" should be construed to mean a "single movable structure" instead of just a "movable structure."  In the '436 Patent prosecution history, the patentee amended Claim 13 (later issued as Claim 9) to clarify that the "food article stop gate" provided the three key functions "as an all-in-one without the need for two structures," as opposed to prior art machines which required additional structures or apparatuses to perform the

16

same functions.  (Doc. #85-17, p. 3.)  The PTO accepted this understanding of the stop gate and agreed that prior art did not describe a stop gate that functioned "like a bridge" (i.e., the "floor" function) "or a gate having two positions for guiding the food article to the slicing station and a scrap removal conveyor."  (Doc. #85-18, p. 3.)  The novelty of this all-in-one feature was again emphasized in the PTO's Notice of Allowance.  (Doc. #85-15, pp. 7–8.)  Taken together, this prosecution history reinforces that the "food article stop gate" is properly construed as a single structure and would be understood as such by a person of ordinary skill in the art.

The final point of dispute regarding the construction of this term is whether the three key functions of the "food article stop gate" should be enumerated, though there is no dispute that the three functions are clearly supported by the intrinsic record and the claim language itself.  During the *Markman* hearing, the parties additionally debated the use of the term "features," "functions," or "positions" to describe those three key functions.[7]  After considering both the advantages and the shortcomings of the parties' arguments, the Court agrees that enumerating the three functions will provide the jury with the most clear and accurate guidance during their deliberations.  As for how the functions should be referenced, the Court finds the term "positions" is supported by the intrinsic record, would aid the jury's understanding, and captures the described functionalities as would be understood by an ordinary person skilled in the art.  Consequently, the Court construes the term "food article stop gate" as follows:

| TERM | CONSTRUCTION |
| --- | --- |
| "food article stop gate" | single movable structure that provides the three positions: (1) gate, (2) bridge, and (3) door |

---

[7] During the *Markman* hearing, the question arose of whether "bridge" should be used in lieu of "floor" when describing the stop gate's supporting position, where the stop gate "act[s] like a bridge over which the food articles can pass from the lift tray assembly to the slicing station."  (Doc. #85, p. 16.)  The parties agreed there is little difference in whether "bridge" or "floor" is used to describe the particular function or position at issue, and the Court ultimately finds "bridge" to be a more descriptive term likely to assist the jury in understanding the meaning and scope of the claims in the Patents-at-Issue.

**D. Term IV: "when the lift tray assembly is moved when in its elevated position"**

The last disputed term at issue in this case is "when the lift tray assembly is moved when in its elevated position."  While Provisur proposes a construction, Weber argues the term cannot be construed at all:

| PROVISUR'S PROPOSED CONSTRUCTION | WEBER'S PROPOSED CONSTRUCTION |
|---|---|
| plain and ordinary meaning, including when the lift tray assembly is moved from its elevated position; term is not indefinite | term is indefinite, not possible to construe |

An illustrative example of the use of the term appears in Claim 1 and Claim 9 of the '436 Patent:

> 1.  A food article slicing machine, comprising:
> . . .
> wherein the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved when in its elevated position[.]

(Doc. #85-1, p. 30, 11:3–6.)

Weber argues the phrase is indefinite and "fails to inform those skilled in the art of the scope of the invention with reasonably certainty."  (Doc. #85, p. 18.)  To begin, Weber states the term "its elevated position" is unclear because there are multiple raised positions that the lift tray assembly can exhibit.  Weber further contends it is unclear if the term "is moved" refers to the pivoting movement of the lift tray assembly from a lower loading position, or other movements that occur when the assembly is in its raised position.  Provisur urges the Court to reject Weber's arguments, contending Weber fails to meet the indefiniteness standard set out by *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Under *Nautilus*, "[a] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Id.*  This standard "mandates

18

clarity, while recognizing that absolute precision is unattainable." *Id.* at 899. Generally, patents enjoy a presumption of validity and a party alleging indefiniteness must support their position by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

After careful consideration of the parties' arguments and the intrinsic record, the Court finds that Weber fails to satisfy their burden of showing, by clear and convincing evidence, that the claims at issue are indefinite. In general, the Court believes a jury will be able to understand the meaning of the words in this disputed term without substantial guidance from the Court. The crux of the parties' dispute is the phrase "moved when in its elevated position" and whether, as Weber contends, that phrase is so "nonsensical" and "incoherent" that an ordinary person skilled in the art would be unable to determine the scope of Claim 1 of the '436 Patent. (Doc. #85, pp. 20, 22.) A review of the intrinsic record, however, demonstrates this particular phrase is not so ambiguous or uncertain that it fails to satisfy the specificity requirements of 35 U.S.C. § 112, nor does it require further construction by the Court. *See Infinity Comput. Prod., Inc. v. Oki Data Americas, Inc.*, 987 F.3d 1053, 1059 (Fed. Cir. 2021) (indefiniteness may be established "from inconsistent prosecution history statements where the claim language and specification on their own leave an uncertainty that, if unresolved, would produce indefiniteness").

Beginning with the claim language itself, Weber points to the nearly-identical language in Claim 1 of the '812 Patent, which uses "when" in place of "from" in the disputed phrase (e.g., "when the lift tray assembly is moved *from* its elevated position") (emphasis added), as evidence of indefiniteness. (Doc. #85-2, p. 30, 11:35–36.) This argument, however, is unpersuasive. A review of the claim specifications and prosecution history for the Patents-at-Issue would inform an ordinary person skilled in the art that the claim language in the '436 Patent is synonymous with corresponding language in the '812 Patent. Without more, the fact that there is variation in

19

the language of the two claims does not compel a finding of indefiniteness as argued by Weber, particularly since the Federal Circuit "acknowledge[s] that two claims with different terminology can define the exact same subject matter." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).

Moreover, the specifications provide sufficient guidance regarding the movement of the lift tray assembly described by the claim language, especially when viewed in the context of the patent as a whole, including the illustrative diagrams. The summary of the '436 Patent explains "a lift tray that is located in line with the food article feed paths and is lowered to receive food articles and raised into the feed paths" and specifies "[t]here is no need for lateral shifting of food articles into the feed paths." (Doc. #85-1, p. 25, 2:53–56.) The movement of the lift tray assembly from the upper or elevated position to the lower position is also visually depicted in Figure 9, "a far side perspective view of the apparatus of FIG. 1 with a lift tray in a lowered position," (Doc. #85-1, p. 25, 3:66–67; Doc. #85-1, p. 20), as well as Figure 10, which shows "an inner frame 375 supports the tray 302 within the frame 290[,]" which "is movable vertically with respect to the frame 290 . . . to an elevated position above the staging position below the feed paths to lift the food articles to be in the food paths and to be gripped by the grippers." (Doc. #85-1, p. 29, 9:45–51; Doc. #85-1, p. 21.) While the specifications do not describe in precise detail the exact parameters of the life tray assembly's movement "when in its elevated position," that is not the standard for showing indefiniteness. Instead, an ordinary person skilled in the art only needs to be "reasonably certain" of the claim's meaning. *See Nautilus*, 572 U.S. at 901.

The Court similarly finds Weber's citations to the prosecution history fall short of what is required to show a claim is invalid for indefiniteness. Weber observes that the disputed phrase was added by amendment "with no elaboration or argument," (Doc. #85, p. 20), and suggests the

20

intrinsic record thus offers no context for understanding the meaning of "moved when in its elevated position." However, the prosecution history's lack of discussion regarding the disputed phrase can just as easily be viewed in Provisur's favor because the PTO's patent examiners are responsible for reviewing proposed claim language and assessing for any indefiniteness during the review process. Presumably, if a patent examiner had concerns about a claim's definiteness, he or she would have raised those concerns. On balance, the prosecution history here does not constitute the clear and convincing evidence needed to establish indefiniteness.

Taken together, the Court finds Weber does not meet their burden of showing, by clear and convincing evidence, that the disputed term is indefinite. The Court agrees with Provisur that an ordinary person skilled in the art would understand the term "when the lift tray assembly is moved when in its elevated position" in Claim 1 of the '436 Patent. Additionally, the Court finds the words which make up the disputed term have plain and ordinary meanings that are easily understood by an ordinary person skilled in the art, and there are not multiple ordinary meanings which necessitate construction by the Court. *See O2 Micro*, 521 F.3d at 1361. Thus, no further construction of this term by the Court is required.

| TERM | CONSTRUCTION |
|---|---|
| "when the lift tray assembly is moved when in its elevated position" | plain and ordinary meaning |

## IV. CONCLUSION

Accordingly, the Court **ORDERS** the constructions of the disputed terms as described herein.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
DATE: August 3, 2021                    UNITED STATES DISTRICT JUDGE

21